UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
===============================X

| | |
|---|---|
| TREASURES LONDON LIMITED and HARJIT SINGH ATHWAL, | Chapter 7 |
| Plaintiffs, | Case No.: 20-10315 |
| | Adversary No.: _____ |
| v. | |
| POONAM KESWANI, | **COMPLAINT TO DETERMINE DISCHARGEABILITY OF DEBT** |
| Debtor/Defendant. | |

===============================X

The Plaintiffs, TREASURES LONDON LIMITED and HARJIT SINGH ATHWAL (collectively "Plaintiff"), by and through their counsel the law offices of Kravis & Wurgaft, P.C., 201 Washington Street, Newark, New Jersey 07102, bring this adversary proceeding pursuant to 11 U.S.C. 523(a)(2)(A), 523(a)(2)(B), 523(a)(4), 523(a)(6), and 727(a)(3), seeking an order determining that the debt(s) owed to the Plaintiff is excepted from discharge.

## JURISDICTION & VENUE

1. This Court has subject matter jurisdiction pursuant to 28 U.S.C. 157 and 1334 and 11 U.S.C. 523.

2. Venue in the Southern District of New York is proper pursuant to 28 U.S.C. 1409(a).

3. This Adversary Proceeding relates to *In re Poonam Keswani*, No. 1:20-bk-10315-JLG (Bank. S.D.N.Y.) now pending in this Court (the "Bankruptcy Case"). The Plaintiff holds general [un]secured claims against the Debtor pursuant to a Promissory Note and a Personal Guarantee. A copy of these documents are annexed hereto as Exhibit "A."

**THE PARTIES**

4. The Plaintiffs, HARJIT SINGH ATHWAL ("Athwal") and TREASURES LONDON LIMITED ("TLL"), are individually and collectively residents of London, England, situated at 555-557, Cranbrook Road, Ilford, IG2 6HE, England, United Kingdom. Mr. Athwal is the director of TLL.

5. TLL is a fully owned company whose Principal is Mr. Athwal. Athwal is a solicitor of the High Court of England and Wales and one of the founding principles of Excel Law of London, an Essex based law firm.

6. The Debtor/Defendant, Poonam Keswani ("Defendant"), is a resident of and domiciled in New York City, with an address at 50 Riverside Boulevard, Apartment 10N, New York, New York 10069.

7. Non-party corporation Treasures of Prince ("TOP") maintains a last known registered office address in New York of 22 West 48th Street, Suite 206, New York, NY 10036 and/or 10 West 47 Street, Suite 1004, New York, NY 10036 as well as an address in California at 1121 East Wilson Avenue, Suite 7 Glendale, CA 91206.

**STATEMENT OF FACTS**

8. At all times mentioned herein, from in or around 2006 through 2010, Athwal and the Defendant became good friends and had commonality of interests, both being of Indian descent and having first made contact in around late 2006 via an online forum following which they exchanged telephone numbers.

9. Despite having never met in person, Athwal and the Defendant built up a friendship by regularly exchanging telephone calls and/or text messages on nearly a daily basis between 2006/2007 and around 2014.

10. The Defendant and Athwal exchanged pictures of themselves including pictures of their friends, family holiday snaps and other day to day activities in which they had a commonality.

11. Between 2006/2007 and 2010, the Defendant was traveling between the Bahamas and Los Angeles where her family was based in the US.

12. During the period of 2006 and 2007 Athwal was a trainee lawyer carrying out his training contract at a small to medium sized law firm in London earning a basic salary.

13. The Defendant informed Athwal that she was running her own jewelry retail stores with her and her brother, along with running the family business in the Bahamas and LA.

14. Athwal received pictures of the Defendant's custom made jewelry that she would then sell and retail on the open market both online and via her retail outlets in Bahamas and LA.

15. The Defendant, in addition to holding herself out to the public as one, had represented to Athwal that she was a certified gemologist, having graduated from the Gemology Institute of America ("GIA").

16. However, based on an online search of the GIA alumni directory and direct enquiries of the GIA, it has subsequently become known that this was a misrepresentation of the Defendant's credentials.

17. Between 2009/2010 and 2012 regular communication between Athwal and the Defendant ceased because Athwal was busy working and running his law firm in London together with significant changes in the Defendant's personal and domestic circumstances.

18. In or around December 2013 Athwal and the Defendant initiated contact once again and communicated as if there was never even a break in time.

19. In or around 2013, the Defendant told Athwal that there was an issue within her family which resulted in her brother having a child by the name of Prince, which the Defendant adopted and that she was now living and working in New York.

20. At no point did the Defendant refer to herself as being or having been married or made any references to any marital or non-marital partner.

21. The information supplied by the Defendant to Athwal between 2006 and 2010 was intended to build confidence in Athwal that the Defendant was a successful businesswoman with proven and certified expertise in gemology and the jewelry business.

22. In or around December, 2013, Athwal informed the Defendant that he was planning a trip to the United States with his family down the East Coast, starting with New York City.

23. By December 2013, the Defendant was aware that Athwal was now well established at his new law firm and was doing well for himself financially.

24. On or about April 2014, Athwal and the Defendant met in New York City

25. Upon finally meeting in person, Athwal and the Defendant got along very well and the Defendant met Athwal's family.

26. On or about April 2014, Athwal and the Defendant went out for dinner and drinks with the Defendant's good friend Judy, all at Athwal's expense.

27. During the aforementioned period Athwal and the Defendant's relationship grew to the point that the Defendant even offered and allowed Athwal and his family to use the Defendant's Black Range Rover for the day so that they could go shopping at the Premium Outlets.

28. During this period Athwal and the Defendant became close and the Defendant showed Athwal pictures of her adopted son Prince, who then was around 3 years of age, although Athwal did not get to meet him during this visit.

29. Athwal and the Defendant also exchanged gifts during this visit and the Defendant made sure to project the image that she was doing well for herself through her designer clothes, accessories, jewelry, apartment and her car.

30. Subsequently, numerous trips were made back and forth by Athwal to New York and the Defendant to London following which Athwal and the Defendant developed a deeper and intimate relationship.

31. Athwal provided the Defendant with further expensive gifts during her London trip in September 2014 and Athwal's subsequent trips to New York in December 2014, June 2015 and April 2016.

32. Further to this, the Defendant encouraged Athwal to develop a close and emotional attachment to her adopted son.

33. On or around April 18, 2016 Athwal received a WhatsApp message from the Defendant stating that Prince *"…is missing you… He said why you had to leave so fast… He wants*

*to play Uno"* and the Defendant continued the following day *"I missed you, Prince was crying… He is attach to You… He really doesn't ask for anyone… or cry for anyone like this."*

34. During Athwal's trips to New York he visited both the Defendant's personal residence and her business premises, which further reinforced Athwal's view that the Defendant was a successful businesswoman.

35. Furthermore, the Defendant would often send Athwal pictures and images of her traveling business/first class back and forth between New York; LA; Bahamas and then later Dubai and India.

36. In March 2016 at 15:29 Athwal received a Whats App message from the Defendant attaching a picture of a large diamond and stating "I just sold this 4.5 million dollar diamond".

37. On April 1, 2016, Athwal received another message from the Defendant stating that she was preparing for a jewelry show in Las Vegas which was said to take place on April 15, 2016.

38. On September 1, 2016, there was a series of WhatsApp messages between Athwal and the Defendant whereby the Defendant confirmed she was setting up an international rough diamond business and asked for advice from Athwal in the opening of a Spanish bank account for one of her business partners.

39. The September 1, 2016 WhatsApp messages were the first references by the Defendant to Athwal about her rough diamond business, as prior to this she had only referred to her online and retail jewelry business.

40. In or around September 7, 2016, Athwal introduced the Defendant to a few of his business contacts who had expressed an interest in transacting in rough diamonds.

41. the Defendant supplied both Athwal and his contacts with a Treasures Group of Companies Letterhead/Profile, which referred to the Defendant as President to various group companies (including amongst others both TOP and Treasures International) based both in New York and Bahamas together with details of external references and holding herself out as a high profile successful entrepreneur.

42. On November, 8 2016 at 22:13 Athwal received a message from the Defendant stating that her bank accounts had been seized and cards been blocked by the IRS for an audit.

43. the Defendant subsequently asked Athwal whether she could transfer $825,800 into his UK bank account, as she needed to complete a Dubai transaction and could not receive the money into her US based account.

44. Athwal agreed to help on the basis that the Defendant was to provide him with details of where the payment was coming from and to ensure it was all legitimate in order to satisfy his bank's Anti Money Laundering policies and that she was to provide him with those details before any wire was done.

45. Athwal never received the information he requested nor the funds.

46. Upon information and belief, the Defendant's November 8, 2016 request was an attempt to deceive the IRS and to launder funds through usages of Athwal's personal bank accounts.

47. On November 9, 2016, Athwal received a similar message from the Defendant that she was due to receive a further sum of $125,000 from a transaction in Paris and was again seeking to use Athwal's UK bank account facilities.

48. Upon information and belief, the Defendant's November 9, 2016 request was another attempt to deceive the IRS and launder sums of money through Athwal's UK Accounts.

49. Again nothing materialized as the Defendant failed to provide Athwal with the audit trail and information he had requested.

50. In or around November 9, 2016, the Defendant had asked Athwal to arrange some funds for her in Dubai to assist her during her trip as her accounts were still frozen.

51. On around November 13, 2016, Athwal arranged for one of his friends to meet the Defendant at her hotel in Dubai and hand over cash equal to the sum of £3,000 GBP/ 13,500 AED in local currency.

52. Athwal eventually reimbursed his friend for the aforementioned payment to the Defendant.

53. Despite numerous requests, the Defendant has failed to return or pay back the funds to Athwal to date.

54. On November 5, 2016, Athwal received a message from the Defendant inquiring whether "do you know anyone that we would be interested in buying rough diamonds…in Dubai…I have almost five thousand carats…interested in buying rough diamonds…I have 550 kg gold coming to Dubai the end of the month as well".

55. On November 16, 2016, Athwal received a message from the Defendant I am attaching pictures of rough diamonds and an inventory sheet. She said that the diamonds originated from Sierra Leone.

56. Again on November 16, 2016, at approximately 21:30 hours, Athwal received another message from the Defendant stating "I got all the documentation done. Got Kimberly export papers, attaching a Kimberly process certificate that is here in loan on November 14, 2016, accompanied with photographs of the sealed envelope with the Sierra Leon stamp and two photographs of the inventory with rough diamonds totaling 173.62 carats and 20.66 carats in weight."

57. On November 17, 2016, Athwal received a message from the Defendant to say she needed $10,000 in AED for brinks and asking whether he could arrange this for her and saying that she would return the funds back to Athwal the following week as she had spoken to IRS and that their audit had almost completed and everything is in order.

58. The Defendant subsequently provided Athwal with the following Dubai bank details on November 19, 2016, Karansingh VINOD purohit , a/c no: 1014999294601, cif no: 49992946, ibn battuta branch, swift code: EBILAEAD, IBAN no: AE240260001014999294601, which she said she had confirmed with Karan in Dubai.

59. Athwal subsequently made an electronic bank remittance from his personal account on November 21, 2016, for the sum of £8,000 GBP as per the bank details provided by the Defendant.

60. The Defendant subsequently acknowledged receipt of the aforementioned funds on November 23, 2016.

61. Again, despite numerous demands for payment, the Defendant has failed to repay Athwal any of these funds to date.

62. The above narrative can now be seen as the period when the Defendant was testing her ability to manipulate and maneuver Athwal into giving her money and from which it later can be demonstrated that the Defendant never had any intention of repaying. the Defendant certainly made no attempts to every repay these funds.

63. The Defendant's reference to and requests for transferring large sums of money to Athwal were either part of a longer term grooming process so as to increase Athwal's confidence in her or testing Athwal's propensity to commit criminal offenses so as to provide the Defendant with leverage at a later date.

64. During all relevant times, the Defendant misrepresented her "credentials" to induce Athwal into extending loans and funds to her and her businesses.

65. Specifically, the Defendant made misrepresentations to Athwal by regularly referencing her GIA certification, certified gemologist and citing her ever-expanding jewelry business in the Bahamas, Dubai and New York together with summary of her affiliations with UNICEF; Member of United Nations Environmental Programme, voluntary work at New York Cares, founding of Prince Foundation (named after her adopted son) and working with Secaucus Mayor, Michael Gonnelli.

66. The Defendant had made further representations, on January 29, 30 and 31, 2017, to Athwal to confirm that her company TOP had no liabilities or payables and sent various images of what appeared to be rough diamond parcels and commenting of her working with people in Dubai and Africa.

67. The Defendant commented that the aforementioned rough diamonds were clean goods and we can make really good profit from cutting and polishing the really big stones and selling to customers in London, USA, and Dubai and to put in retail in the Defendant's Bahamas store at Atlantis where she has really good customers and buyers.

68. The Defendant further represented that the parcels were already in Dubai and she would be hand picking the goods herself personally and would provide Athwal with the details of the stones and carat weight from there together with a full trail and explanation of the inventory and purchases.

69. In or around January 2017, the Defendant presented Athwal with a new business opportunity, namely de-sourcing, processing a subsequent sale of rough diamonds throughout the US, London, USA and the Defendant's already existing new clients.

70. On or about January 31, 2017, Athwal agreed with the Defendant via the WhatsApp correspondence on terms to set up a new Limited Company in the UK ("TLL"), in which TOP and Athwal would be equal shareholders. However, due to the urgent timings impressed upon Athwal by the Defendant and on the advice of Athwal's accountant, it had subsequently been agreed that the Defendant would conduct her business through TOP and Athwal would do so via TLL only, without either having any shareholding in each other's entities.

71. As per the Defendant's message to Athwal, it was subsequently agreed that Athwal would provide the funds by way of a loan from TLL to TOP and TOP would return back the initial principal to TLL and going forward TOP would distribute a return on the loan to TLL by way of profits accumulated by TOP on the said transactions.

72. On January 31, 2017, the Defendant asked Athwal whether she should fly to Dubai via London to sign the loan documents and Personal Guarantee ("PG"), to which Athwal replied in the affirmative.

73. Furthermore, Athwal expressed concern with the loan being unsecured, to which the Defendant inquired as to what Athwal would need to secure the loan and that if he were in NY she would have given him diamonds as collateral to hold against it and that she would bring a 10 carat diamond ring for Athwal to hold and secure his loan, which the Defendant claimed was worth a lot more than $400,000.

74. The Defendant confirmed to Athwal that the Original Loan would be returned to TLL within a period of 4 to 6 months together with a return of an equal-share of all profits made by TOP and generated through retail sales of the cut and polished diamonds.

75. On January 31, 2017, the Defendant requested an immediate disbursement from Athwal of $400,000.00 as she had allegedly been offered the opportunity to purchase a parcel of diamonds, as she stated in her WhatsApp message to the same day at 12:48 P.M. "we will lose this deal...it's really good."

76. Following the Defendant's January 31, 2017 request, on February 2, 2017, Athwal transferred £317,830.62 ($399,980.00) ("Original Loan") from his personal account to TOP (as per Bank Details supplied by the Defendant as: Treasures Of Prince, 22 West 48th Street, Suite 206, New York, NY 10036, Chase Bank; Account Name: Treasures of Prince; Account Number: 13657130).

77. On February 6, 2017, the Defendant further confirmed that in relation to the return of TLL's Original Loan and profit, that the sale of a single diamond could generate enough funds to return the Original Loan with the remaining sales generating pure profit.

78. Subsequent to the initial Loan Disbursement by TLL/Athwal to TOP, On February 16, 2017, the Defendant sent the following message to Athwal, "So I will involve you with one transaction for now and you see how it goes love". "Once I receive the parcel in New York which I already shipped from UAE I will take the funds out of total $800k and give you the inventory list…fair enough...$400k from you and $400k from me and forget about the travel expense" "In two months I will have a cash flow from the parcel. "Love you…Will secure your funds…don't worry…send you the profit and funds before you even realize…I promise you…my word to you…even if I lose...your funds are safe with me….you dealing with me not Africa."

79. On or around March 28, 2017, TLL provided TOP with a further loan by advancing the sum of £60,000.00 ($74,334) ("Second Advance"), representing TLL's contribution towards the purchase of another parcel of rough diamonds.

80. On or around May 18, 2017, TLL provided TOP with a further loan by advancing the sum of £47,270.30 ($59,964) ("Third Advance") representing TLL's contribution towards an alleged acquisition of 1000 carats of diamonds.

81. On  or around June 12, 2017, TLL provided TOP with a further loan by advancing the sum of £300,000 ($377,400) ("Fourth Advance"), as a contribution towards an alleged purchase of 793 carats of diamonds.

82. On October 3, 2017, Athwal received an email correspondence from the Defendant, whereby she represented that she was with her accountant and they were in the process of submitting a repayment of the loaned funds in the amount of $1,000,000.00.

83. Despite the Defendant's October 3, 2017, representation, no repayment was ever processed or received by TLL/Athwal.

84. Due to the fact that the aforementioned $1,000,000.00 repayment never materialized, Athwal became increasingly concerned about the viability of the loan he extended to the Defendant and TOP.

85. In response to Athwal's concerns, specifically related to TOP's ability to repay the aforementioned loans, on October 24, 2017, the Defendant executed a Personal Guaranty, whereby the Defendant expressly agreed to personally guaranty the debts owed to TLL.

86. As of November 10, 2017, the Defendant expressly acknowledged receipt of $922,000.00 from TLL/Athwal, acknowledged that the total debt owed to TLL as of said date was $2,000,000.00 and expressly affirmed her promise to repay the sum of $2,000,000.00 to TLL/Athwal in relation to same.

87. In response to Athwal's numerous subsequent demands for repayment of the debt, the Defendant has fabricated elaborate tales of woe and excuses for her delays, all of which were patently false and intended to deceive Athwal.

88. Despite numerous subsequent demands for repayment, the Defendant has failed to repay any of the funds that she has acknowledged are due and owing to TLL/Athwal, to date.

89. Upon information and belief, the Defendant misappropriated the loan funds to support her lavish lifestyle, finance her personal movie and entertainment venture, finance her first class world-wide travel, and to finance upgrades to her personal residence.

## COUNT I
### (NON-DISCHARGEABLE DEBT FOR MONEY OBTAINED BY FALSE PRETENSES, FALSE REPRESENTATIONS OR ACTUAL FRAUD)

90. The Plaintiffs repeat and reallege each of the allegations contained in the preceding paragraphs as if fully set forth herein at length.

91. Debtor/Defendant engaged in an elaborate scheme to defraud the Plaintiffs into extending the Loan, through the use of false pretenses, false representations and actual fraud.

92. Debtor/Defendant falsely led the Plaintiffs to believe that she was romantically interested in Plaintiff, Athwal, that she had an adopted son who she wanted to Plaintiff to have a relationship with and that she was beginning a new business venture that was in need of a Loan to purchase product with.

93. Furthermore, Defendant/Debtor made countless misrepresentations to Plaintiffs in order to induce them into extending the Loan. Debtor/Defendant's misrepresentations included, but are not limited to, that Debtor/Defendant is a GIA certified gemologist, that Plaintiff's funds were to be used to purchase raw diamonds that would then be resold in the retail market, that said funds were in fact used for her stated purpose and additional funds were necessary, and that she had adequate security that could be utilized to repay the Loan at anytime.

94. Debtor/Defendant further executed a personal guaranty in connection with the Loan in order to further induce the Plaintiffs into extending the Loan, despite the fact that Debtor/ Defendant knew she lacked the resources necessary to guaranty same.

95. In numerous instances, in connection with the Debtor/Defendant's fraud upon the Plaintiffs, the Debtor/Defendant, directly or indirectly, expressly or by implication, represented that the Plaintiffs' loans were to be used for legitimate business purposes and expenditures.

96. In truth and in fact, Plaintiffs' loans were not used by the Debtor/Defendant for legitimate business purposes and expenditures. Instead, the Debtor/Defendant used the Plaintiff's loans to fund her lavish personal lifestyle and for personal expenses.

97. In an attempt to conceal her fraudulent conduct and in furtherance of her fraudulent scheme, Debtor/Defendant committed fraud on the court and perjury in the matter currently pending in New York Supreme Court (Index No. 652666/2019).

98. In response to Plaintiffs' discovery demands, whereby Debtor/Defendant was confronted with the aforementioned allegations the Debtor/Defendant attempted to show that the Plaintiffs' loans were in fact used for legitimate business purposes by fabricating, falsifying and subsequently exchanging fraudulent Chase Bank account statements. See Exhibit "B."

99. In truth and in fact, when the Plaintiffs' received the actual statements — annexed hereto as Exhibit "C" — which had been subpoenaed directly from Chase Bank, they were markedly different than those exchanged by the Debtor/Defendant in discovery, and

clearly showed a willful effort to deceive and defraud the Plaintiff and the Court as to the existence, use, and location of Plaintiffs' loan funds. See Exhibits "B" & "C."

100. Debtor/Defendant's knowingly made false and misleading statements to the Plaintiffs with the intention that Plaintiffs relied upon same in deciding to extend the Loans.

101. Debtor/Defendant knowingly engaged in deceptive business practices and has continued to commit fraudulent acts in furtherance of said fraud by falsifying and/or fabricating the Chase Bank statements which were exchanged in the course of discovery.

102. Debtor/Defendant injured the Plaintiff by knowingly engaging in a fraudulent scheme, knowingly making false representations to the Plaintiff, and using false pretenses to induce the Plaintiffs into extending her the Loan at issue before this Court. These false representations and false pretenses were material to the Plaintiff's course of business with the Debtor/Defendant and the Plaintiffs' decision to loan the Debtor/Defendant money.

103. The Plaintiff's reliance on the Debtor/Defendant's mis-representations was justifiable.

104. The total amount of money the Debtor/Defendant obtained from the Plaintiffs by such false pretenses, false representations and/or actual fraud is at least NINE HUNDRED TWENTY TWO THOUSAND ($922,000.00) DOLLARS.

105. Consequently, the Debtor/Defendant's debt to the Plaintiffs is one for money, property or services obtained by false pretenses, false representations or actual fraud, and is excepted from discharge pursuant to 11 U.S.C. 523(a)(2)(A).

**WHEREFORE**, the Plaintiff respectfully requests that the Court:

A. Determine that the monetary portion of the Plaintiff's fraud and related claims against the Debtor/Defendant are non dischargeable pursuant to 11 U.S.C. 523(a)(2)(A);

B.  Grant the Plaintiffs relief from the automatic stay, so as to permit the Plaintiffs to continue pursuing the New York State Supreme Court matter as described herein; and

C.  For such other and further relief as this Court deems just and proper under the circumstances.

### COUNT II
### (NON-DISCHARGEABLE DEBT FOR MONEY OBTAINED BY USE OF A MATERIALLY FALSE STATEMENT IN A WRITING)

106.  The Plaintiffs repeat and reallege each of the allegations contained in the preceding paragraphs as if fully set forth herein at length.

107.  Debtor/Defendant regularly sent written text/WhatsApp messages to Plaintiffs that were materially false and misleading in order to induce Plaintiff into providing the Loan.

108.  In addition, Debtor/Defendant sent Plaintiffs materially false statements, in writing, with regards to the purported new business venture, the Debtor/Defendant's credentials and the use of the loaned funds.

109.  Debtor/Defendant sent the materially false written statements to Plaintiffs with knowledge that said statements were false and with the intention that Plaintiffs rely upon same in making the decision to extend her the Loan.

110.  Debtor/Defendant made the materially false statements, in writing, to Plaintiff in furtherance of her scheme to defraud Plaintiffs out of the Loan funds.

111.  Plaintiffs justifiably relied upon the Debtor/Defendant's materially false written statements in deciding to extend the Loan to Debtor/Defendant.

112.    As a result of Plaintiffs' reliance upon Debtor/Defendant's materially false statements, the Plaintiffs have suffered damages in the amount of no less that TWO MILLION ($2,000,000.00) DOLLARS.

113.    Consequently, the Debtor/Defendant's debt owed to the Plaintiffs is one for money, property or services obtained by the use of a materially false statements contained in a writing, upon which the Plaintiff relied, and is excepted from discharge pursuant to 11 U.S.C. 523(a)(2)(B).

**WHEREFORE**, the Plaintiff respectfully requests that the Court:

A.  Determine that the monetary portion of the Plaintiff's fraud and related claims against the Debtor/Defendant are non dischargeable pursuant to 11 U.S.C. 523(a)(2)(B);

B.  Grant the Plaintiffs relief from the automatic stay, so as to permit the Plaintiffs to continue pursuing the New York State Supreme Court matter as described herein; and

C.  For such other and further relief as this Court deeds just and proper under the circumstances.

<u>**COUNT III**</u>
**(NON-DISCHARGEABLE DEBT FOR MONEY OBTAINED BY FRAUD WHILE ACTING IN A FIDUCIARY CAPACITY, EMBEZZLEMENT OR LARCENY)**

114.    The Plaintiffs repeat and reallege each of the allegations contained in the preceding paragraphs as if fully set forth herein at length.

115.    The Debtor/Defendant, as the sole member of Treasures of Prince, LLC, held the monies loaned to Treasures of Prince by the Plaintiff in trust for the Plaintiffs and for TOP.

116.    Debtor/Defendant abused her position as the custodian/trustee of the loaned funds by embezzling said funds to pay for her lavish lifestyle and personal expenses.

117.    Debtor/Defendant took and used the monies loaned by the Plaintiff for purposes that the Plaintiff did not permit, namely to support a lavish lifestyle, pay for her personal expenses and other unauthorized expenditures of the Debtor/Defendant.

118.    As a result of the Debtor/Defendant's false pretenses, false and misleading statements and misrepresentations aimed at the Plaintiffs, the Debtor/Defendant gained a significant benefit in the form of monies which she embezzled and used for improper purposes not contemplated by the parties' Agreement.

119.    Based upon the totality of circumstances, the Court can clearly conclude that Debtor/Defendant benefitted from her fraudulent conduct and the embezzlement of the Loan funds at the expense and to the detriment of the Plaintiffs.

120.    As a result, the Plaintiffs have suffered damages in the amount of no less than TWO MILLION ($2,000,000.00) DOLLARS.

121.    Consequently, the Debtor/Defendant's debt to the Plaintiffs is one for money, property or services obtained by fraud while the Debtor/Defendant was acting in a fiduciary capacity or engaged in embezzlement or larceny, and is excepted from discharge pursuant to 11 U.S.C. 523(a)(4).

**WHEREFORE**, the Plaintiff respectfully requests that the Court:

A.  Determine that the monetary portion of the Plaintiff's fraud and related claims against the Debtor/Defendant are non dischargeable pursuant to 11 U.S.C. 523(a)(4);

B.  Grant the Plaintiffs relief from the automatic stay, so as to permit the Plaintiffs to continue pursuing the New York State Supreme Court matter as described herein; and

C. For such other and further relief as this Court deeds just and proper under the circumstances.

## COUNT IV
## (NON-DISCHARGEABLE DEBT FOR MONEY OBTAINED BY WILLFUL AND MALICIOUS INJURY)

122. The Plaintiffs repeat and reallege each of the allegations contained in the preceding paragraphs as if fully set forth herein at length.

123. Debtor/Defendant engaged in the aforementioned elaborate and multi-year scheme to defraud the Plaintiffs out of significant monetary amounts.

124. Debtor/Defendant's fraudulent acts were calculated, intentional and clearly willful/ malicious acts intended to cause Plaintiffs substantial monetary injuries.

125. As a result of Debtor/Defendant's willful and malicious fraudulent acts, Plaintiffs have suffered a pecuniary injury in the amount of no less than TWO MILLION ($2,000,000.00) DOLLARS.

126. Consequently, the Debtor/Defendant's debt to the Plaintiffs is one for money, property or services obtained by willful and malicious injury by the Debtor/Defendant, and is excepted from discharge pursuant to 11 U.S.C. 523(a)(6).

**WHEREFORE**, the Plaintiff respectfully requests that the Court:

A. Determine that the monetary portion of the Plaintiff's fraud and related claims against the Debtor/Defendant are non dischargeable pursuant to 11 U.S.C. 523(a)(6);

B. Grant the Plaintiffs relief from the automatic stay, so as to permit the Plaintiffs to continue pursuing the New York State Supreme Court matter as described herein; and

C. For such other and further relief as this Court deeds just and proper under the circumstances.

## COUNT V
### (NON-DISCHARGEABLE DEBT FOR DEBTOR'S UNJUSTIFIED FALSIFICATION OF RECORDS)

127. The Plaintiffs repeat and reallege each of the allegations contained in the preceding paragraphs as if fully set forth herein at length.

128. In furtherance of her fraudulent scheme and in an attempt to conceal her fraudulent conduct, Debtor/Defendant falsified multiple Chase Bank Statements intended to deceive Plaintiffs into believing the Loan proceeds were utilized for legitimate business purposes. See Exhibits "B" & "C."

129. In addition, Debtor/Defendant provided Plaintiffs with falsified financial statements that purport to demonstrate that Debtor/Defendant's inability to repay the Loan was due to legitimate losses incurred by Treasures of Prince. See Exhibit "D."

130. Debtor/Defendant's falsification of the aforementioned records was willful and intended to mislead the Plaintiffs in furtherance of her fraud.

131. As a result of Debtor/Defendant's falsification of records, Plaintiffs' efforts to collect the debt owed has been significantly hampered and delayed, resulting in damages in an amount of no less than TWO MILLION ($2,000,000.00) DOLLARS.

132. Consequently, the Debtor/Defendant's debt to the Plaintiffs is one for money, property or services obtained by willful and malicious injury by the Debtor/Defendant, and is excepted from discharge pursuant to 11 U.S.C. 727(a)(3).

**WHEREFORE**, the Plaintiff respectfully requests that the Court:

A.  Determine that the monetary portion of the Plaintiff's fraud and related claims against the Debtor/Defendant are non dischargeable pursuant to 11 U.S.C. 727(a)(3);

B.  Grant the Plaintiffs relief from the automatic stay, so as to permit the Plaintiffs to continue pursuing the New York State Supreme Court matter as described herein; and

C.  For such other and further relief as this Court deeds just and proper under the circumstances.

Dated: Newark, New Jersey                          KRAVIS & WURGAFT, P.C.
       May 5, 2020                                 *Attorneys for Plaintiffs*

                                                   _____
                                                   Matthew A. Wurgaft